## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) |
| v. | )    Case No. 1:19-CR-10081-IT |
| | ) |
| | ) |
| NIKI WILLIAMS & | ) |
| GORDON ERNST, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT NIKI WILLIAMS' REVISED
## MOTION TO DISMISS INDICTMENT

Defendant Niki Williams ("Williams") hereby moves the Court to dismiss the

Superceding Indictment [Dkt. No. 272] pursuant to Rule 12(b)(3)(B) of the Federal Rules of

Criminal Procedure.  As set forth below, the Court should dismiss the Indictment because it fails

to state an criminal offense against Williams. Williams also joins her co-defendant, Donna

Heinel's, motion to dismiss for the reasons raised in her brief. Williams will not repeat those

reasons here, but simply incorporate the same argument.

## I.     INTRODUCTION

This case is an unprecedented attempt by the government to prosecute various

individuals—most of whom are located in different states across the country and never met

eachother or agreed to engage in any conduct with one another, let alone illegal conduct—with

operating a wide-ranging, multi-year criminal enterprise. At the center of the alleged enterprise is

Rick Singer ("Singer"), who allegedly worked with various of the defendants on two schemes

related to college admission—(i) a standardized test cheating scheme, and (ii) an athletic

recruitment scheme. The government relies on a overly-expansive application of the federal

RICO statute and defective charges under the mail fraud, wire fraud, and money laundering

1

statutes, to prosecute Williams—a special education teacher's aide from Houston, Texas—with crimes typically reserved for the mafia and drug cartels.

Williams served as a standardized test administrator for the College Board and ACT, Inc., which administer the SAT and ACT standardized examinations often used as part of the college admission process. The Indictment alleges that Singer paid Williams $5,000 to allow one of his associates, Mark Riddell ("Riddell"), to either take exams in place of the children of some of Singer's clients, or to alter their test answers. For this discrete alleged conduct, according to the government, Williams became part of sprawling RICO conspiracy with individuals located across the country, who she is not alleged to have ever met or had any agreement to do anything with, in violation of the honest services mail and wire fraud statute, the money and property mail and wire fraud statutes, and the money laundering statute.

But the government's RICO conspiracy charge is fatally deficient as to Williams, because it does not sufficiently allege the commission of *any* of the alleged predicate offenses.  The honest services fraud predicate offense fails because the Indictment does not allege that Williams agreed to violate a cognizable fiduciary duty and, in any event, the honest services fraud statute is unconstitutionally vague as applied to this case. The money and property mail and wire fraud predicate offenses fail because the Indictment does not sufficiently allege that Williams agreed to deprive the College Board or ACT, Inc. of an actionable property interest. And the money laundering predicate offense fails because the Indictment does not allege that Williams agreed to participate in any financial transaction using the proceeds of a specified unlawful activity.

The Superseding Indictment also charges Williams, separately, with an independent count of Honest Services fraud and conspiracy to commit the same. *See* Indictment, Counts 2 and 8. Substantively, the new charges do not change the calculus. The Government has failed to

state a claim under these counts for the same reasons the Government has failed to state a claim under RICO.

## II.    THE INDICTMENT

In 2007, William Rick Singer ("Singer") established the Edge College & Career Network, LLC (the "Key") as a for-profit college counseling and preparation business. Indictment ¶ 15. In 2012, Singer founded the Key Worldwide Foundation ("KWF") as a non-profit corporation. *Id.* ¶ 16. In 2013, the Internal Revenue Service approved KWF as a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code. *Id.*

ACT, Inc., is a non-profit organization headquartered in Iowa that administers the ACT exam. *Id.* ¶ 18. The College Board is a non-profit organization headquartered in New York that develops and administeres the SAT. *Id.* ¶ 19. The ACT and SAT are standardized tests widely used as part of the college admissions process in the United States. *Id.*

Most selective colleges in the United States require students to take standardized tests such as the ACT and SAT as part of the admissions process. *Id.* ¶ 26. The ACT and the SAT are typically administered to large groups of students on specified dates and under strict time limits. *Id.* ¶ 29. In some instances students with certain learning or other disabilities may qualify for extended time and, in such circumstances, may take the test alone, under the supervision of a test administrator retained by the ACT, Inc. or the College Board. *Id.*

Prior to administering the ACT, test administrators must typically certify that they will administer the test in accordance with the ACT Administration Manual, and will ensure that the "test materials are kept secure and confidential, used for this examinee only, and returned to the ACT immediately after testing." *Id.* ¶ 30. Similarly, prior to administering the SAT, test administrators must typically certify that they will administer the test in accordance with the

SAT coordinator's manual, that the SAT is the property of the College Board, and that no one other than the student can "open a test book and see the test content." *Id.* ¶ 31.

Williams was employed as an assistant teacher at a public highschool in Houston, Texas. Indictment ¶ 4. Williams also served as a compensated standardized test administrator for the College Board and ACT, Inc. *Id.*

Singer arranged with clients, whose children were scheduled to take the SAT or ACT exams, to have Ridell either take the tests in their children's place or correct the children's answers after they completed the tests. *Id.* ¶ 39. Parents generally paid Singer between $15,000 and $75,000 per test, typically structuring the payments as purported donations to KWF that they wired or deposited into a KWF account. *Id.* ¶ 40. To facilitate the cheating, Singer counseled parents to seek extended time on the exams, including by having their children purport to have learning disabilities in order to obtain medical documentation that ACT, Inc. and the College Board typically required before granting students extended time. *Id.* ¶ 41.

Singer used the purported charitable donations from parents to pay Williams, who administered the ACT and SAT exams in Houston. *Id.* ¶ 42. Singer initially funneled payments to Williams through an individual named Martin Fox, but in July 2018, Singer sent Williams a $5,000 check directly. *Id.* ¶ 43. In exchange for the payments, Williams allowed Riddell to secretly take the ACT and SAT tests in place of the children of Singer's clients, or to replace the children's exam responses with his own. *Id.* ¶ 45. Singer's clients (or children) then submitted the fraudulently obtained scored to schools nationwide; on or about November 21, 2016, one applicant submitted a score obtained under Williams to Boston College. *Id.* ¶ 48.

### III.     ARGUMENT

#### A.  Relevant legal standard.

Under Rule 12(b)(3)(B), the Court may hear a motion alleging a defect in the indictment and a claim that the indictment fails to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B). Accordingly, when a defendant challenges "the legal (as opposed to factual) sufficiency of an indictment a court must determine whether the indictment 'contains the elements of the offense charged.'" *United States v. Cadden*, 2016 WL 5329565, at *1 (D. Mass. Sept. 21, 2016 (Stearns, J.) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). If the indictment fails to state an element of the offense then it must be dismissed. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quotations omitted).

To convict Williams of conspiring to violate RICO, the government must prove, among other things, that the defendants "agree[d] to commit, or in fact commit[ed] two or more predicate offenses." *United States v. Ramirez-Rivera*, 800 F.3d 1, 18 (1st Cir. 2015) (quoting *United States v. Shifman*, 124 F.3d 31, 35 (1st Cir. 1997)).  It is well settled that "each [alleged] conspirator must have specifically intended that *some conspirator* commit each element of" the predicate offense. *Ocasio v. United States*, 136 S. Ct. 1423, 1432 (2016). And where an alleged agreement does not have an "illegal goal," the alleged conspiracy fails. *See Salinas v. United States*, 522 U.S. 52, 65 (1997).

In assessing whether to dismiss an indictment for failure to adequately allege an offense, the Court need not—and should not—accept conclusory allegations unsupported by pleaded facts.  *See United States v. Grass*, 274 F.Supp.2d 648, 657 (M.D. Pa. 2003) (while the Court "is required to accept the factual allegations in [an] Indictment as true" when ruling on a motion to dismiss, where the accusations "amount to nothing more than a speculative and incorrect legal

5

conclusion unsupported by factual allegations," the Indictment "is entitled to no deference."); *see also Clay v. United States*, 218 F.2d 483, 486 (5th Cir. 1955).

> **B. The Indictment does not allege that Williams had any agreement with anyone, other than possibly with Singer, to do anything to facilitate cheating on standardized tests.**

For the Indictment to sufficiently allege a RICO conspiracy against Williams, it must allege that Williams agreed and intended to commit two or more predicate offenses in connection with the alleged scheme involving cheating on the standardized tests. *See, e.g.*, *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1052 (D.C. Cir. 2012) (upholding dismissal of RICO conspiracy claim for "fail[ure] to allege facts sufficient to support a plausible inference that [defendant] knew of and agreed to further the bribery-racketeering conspiracy.").[1] The Indictment does not allege that Williams knew any of the other defendants or anyone else identified in the Indictment.[2] Nor does the Indictment allege that Williams had any agreement with anyone, including Singer, that any defendant commit any of the acts alleged in the "student-athlete recruitment scam," or that she even knew that alleged "scam" existed. *See* Indictment at ¶¶ 50-127.

Instead, from the face of the Indictment, and reading it in the light most charitable to the government, Williams is only alleged (at most) to have agreed to facilitate cheating on the ACT and SAT in exchange for payments from Singer. *See* Indictment at ¶¶ 39-48. But the Indictment does not allege that Williams owed a fiduciary duty to ACT and the College Board, and she

---

[1] The First Circuit has held that precedent in civil RICO cases is applicable to criminal RICO cases. *See Shifman,* 124 F.3d at 35 n.1 (1st Cir. 1997) ("[I]t is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability" because "[t]he standard is the same for both criminal and civil RICO violations.") (citing 18 U.S.C. § 1962).

[2] The Indictment alleges that Singer initially funneled bribe payments to Williams through co-defendant Martin Fox, but does not include any allegations that Fox and Williams knew eachother or had any agreement between them.

didn't. Even assuming all of the remaining allegations to be true, the Indictment fails to state a

claim because the existence of a fiduciary duty is an element of honest services fraud.

### C. The honest services fraud predicates/charges must be dismissed.

#### 1. The Indictment does not allege that Williams breached a cognizable fiduciary duty.

The honest services fraud statute prohibits any "scheme or artifice to deprive another of

the intangible right of honest services." 18 U.S.C. § 1346. The "intangible right to honest

services" is not defined by law. However, in *Skilling v. United States*, 561 U.S. 358, 412 (2010),

the Supreme Court held that the "intangible right of honest services" set out in 18 U.S.C. § 1346

"would be unconstitutionally vague unless it was limited to schemes to defraud that involve

bribes or kickbacks." *United States v. George*, 676 F.3d 249, 252 (1st Cir. 2012) (citing *Skilling*,

561 U.S. at 411-14). The Supreme Court "pared" the honest services statute down to its "core,"

which it described as both (1) "fraudulent schemes to deprive another of honest services through

bribes or kickbacks supplied by a third party who had not been deceived," and (2) cases that

"involv[e] offenders who, in violation of a fiduciary duty, participated in bribery or kickback

schemes." *Id.* at 404 & 407.

Consistent with *Skilling*, courts have recognized that honest services fraud requires the

existence and breach of a "fiduciary duty." *See United States v. Urciuloi*, 613 F.3d 11, 17-18 (1st

Cir. 2010) (recognizing that some "fiduciary" needs to violate his or her duty for an honest

services conviction to stand); *United States v. Czubinski*, 106 F.3d 1069, 1077 (1st Cir. 1997);

*United States v. Halloran*, 821 F.3d 321, 337 (2d Cir. 2016).

In a typical bribe and kickback honest services fraud cases, "[t]he existence of a fiduciary

relationship, under any definition of that term, was usually beyond dispute," and cited examples

including "public official-public," "employee-employer," and "union official-union members."

*Skilling*, 554 F.3d at 407 n.41. But while honest services fraud has in some cases been applied to

private-sector conduct, it has "mainly been used to punish fraud against the citizenry perpetrated by government officials." *United States v. Martin*, 228 F.3d 1, 17 (1st Cir. 2000); *see also Skilling*, 561 U.S. at 399-402 (discussing the statute's history).

Accordingly, for honest services fraud to serve as a RICO conspiracy predicate offense, or as a stand-alone count, the government must allege that defendants agreed and intended for Williams to breach a fiduciary duty owed to the College Board or ACT, Inc. The First Circuit has not decided whether § 1346 can reach a private sector relationship like the one here, where Williams is not alleged to be an employee of either ACT, Inc. or the College Board, but was merely compensated to administer a standardized test as an independent contractor. Nonetheless, serious constitutional concerns arise "as one moves beyond the core misconduct covered by the statute (*e.g.*, taking a bribe for a legislative vote)." *United States v. Urciuloi*, 513 F.3d 290, 294 (1st Cir. 2008).

Here, the Indictment fails to specify the source or existence of any purported fiduciary duty owed by Williams to the College Board or ACT, Inc. *Cf. United States v. States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996) (holding that not all "reprehensible misconduct" constitutes a breach of fiduciary duty sufficient to establish honest services fraud). Nor could it. "An independent contractor," like Williams was with the College Board and ACT, Inc., "does not typically owe a fiduciary duty for the services it performs." *Spring Inv'r Servs., Inc. v. Carrington Capital Mgmt., LLC*, 2013 WL 1703890, at *7 (D. Mass. Apr. 18, 2013) (citation omitted); *see also Bennett Importing v. Cont'l Airlines*, 1998 34031697, at *5 (D. Mass. Dec. 27, 1998) ("It is well-settled that a person who contracts to perform an act for another, but who is not a fiduciary for the 'other,' is an independent contractor, not an agent.").

The Indictment only alleges that Williams was compensated to administer the ACT and SAT examinations. That threadbare allegation is insufficient to allege the existence, scope, or

breach, of any fiduciary duty by Williams as to the College Board or ACT, Inc. And in the

absence of an agreement to receive a bribe in violation of a breach of a fiduciary duty, honest

services fraud cannot serve as a predicate to a RICO conspiracy. *See Urciuoli*, 613 F.3d at 17-18.

The Court should therefore dismiss the honest services fraud predicate offense.

> ## 2. Alternatively, the honest services fraud predicate, and independent charges, must be dismissed because they are unconstitutionally vague as applied.

Even if the Court determines that the Indictment adequately alleges an agreement and

intent to violate a specified fiduciary duty, the honest services fraud predicate to the RICO

conspiracy, and the independent charges, should nonetheless be dismissed because the statute is

unconstitutionally vague as applied here.

"A criminal statute must clearly define the conduct it proscribes." *Skilling*, 561 U.S. at

415 (Scalia, J., concurring in part) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108

(1972)). "[A] law is unconstitutionally vague if it fails to give ordinary people fair notice of

what is forbidden, or if it fails to give the designated enforcers (police, prosecutors, judges, and

juries) explicit standards (thus creating a risk of arbitrary enforcement)." *United States v.*

*Morosco*, 822 F.3d 1, 5 (1st Cir. 2016). "A statute that is unconstitutionally vague cannot be

saved by a more precise indictment[,] nor by judicial construction that writes in specific criteria

that its text does not contain." *Skilling*, 561 U.S. at 415-16 (citing *Lanzetta v. New Jersey*, 306

U.S. 451, 453 (1939) and *United States v. Reese*, 92 U.S.C 214, 219-21 (1876)).

"Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional

pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325

(2019) (citation omitted). "Vague laws contravene the first essential of due process of law that

statutes must give people of common intelligence fair notice of what the law demands of them."

*Id.* (citations and quotations omitted). "Vague laws also undermine the Constitution's separation

of powers and the democratic self-governance it aims to protect . . . [by] threaten[ing] to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.* (ciations omitted).

The honest services fraud statute, 18 U.S.C. § 1346, does not mention or reference the requirement that the offender participate in bribery or kickback schemes "in violation of a fiduciary duty." Rather, the "violation of a fiduciary duty" requirement for honest services fraud was established by the Supreme Court in *Skilling*. The problem, however—discussed at length by Justice Scalia in his concurring opinion in *Skilling, see Skilling*, at 415-25—is that the fiduciary duty requirement does not provide adequate notice as to what type of relationships and conduct will violate the honest services fraud statute. Justice Scalia's thoughtful criticism of the vagueness this created prompted the majority in *Skilling* to respond that the existence of a fiduciary relationship was "usually beyond dispute" in the honest services fraud cases, which (according to the majority) typically involve employer/employee, public official/public, or union-official/union-member relationships. *See Skilling*, 561 U.S. at 407, n.41.

To be sure, courts have recognized that the examples of fiduciary relationships identified in *Skilling* are not exhaustive of the type of relationships that can give rise to an honest services fraud prosecution. Courts have identified various other relationships that may qualify, "such as attorney-client, doctor-patient, or stockbroker-customer." *United States v. Scanolon*, 753 F. Supp. 2d 23, 25 (D.D.C. 2010); *but see United States v. Evans*, 2015 WL 1808904, at *5 (S.D.W. Va. Apr. 21, 2015) (finding that no fiduciary relationship existed, sufficient to sustain an honest services fraud conviction, between an employee of a company and that company's parent company). But none of those judicially recognized relationhips are present here. Williams was not an employee of the ACT, Inc. or the College Board. Nor was she in any other relationship

that was "beyond dispute" fiduciary in nature (*e.g.* attorney-client, doctor-patient, etc). Instead, Williams was, at best, merely an independent contractor with the ACT, Inc. and College Board; she was paid a nominal fee to administer those entities' standardized tests.

Accordingly, as applied to this case, "[t]he fiduciary duty requirement [of honest services fraud] implicates a troubling analysis that has divided federal courts throughout the country." *United States v. Lusk*, 2017 WL 508589, at *9 (S.D.W. Va. Feb. 7, 2017). This "troubling analysis" renders the honest services fraud statute unconstitutionally vague here. It entails determining (i) what types of relationships potentially give rise to the requisite fiduciary duty, (ii) the legal sources of the fiduciary duty, and (iii) the nature and scope of any fiduciary duty. *See id.* And depending on the jurisdiction in which an honest services fraud prosecution occurs, the types of relationships that create fiduciary duties, the legal sources of the fiduciary duty (i.e., common law, federal law, or state law), and the nature and the scope of any fiduciary duties, all may vary or conflict.

Courts have turned to "a smorgasbord of sources to find the requisite fiduciary duty, and appear to be divided into three general camps: those that permit the fiduciary duty to be derived from various sources, including state, federal, and common law; those that require the fiduciary duty to be derived from state law; and those that require the fiduciary duty to be derived from federal law." *United States v. Smith*, 985 F. Supp. 2d 547, 597-98 (S.D.N.Y. 2014); *see also Lusk*, 2017 WL 50589, at *10 ("[N]umerous courts have addressed this issue . . . and reached wildly different determination as to the permissible sources of fiduciary duties that can sustain an honest-services offense."). As a result, "[t]his analysis is substantially muddled by the fact that the term 'fiduciary duty' has different meanings in different contexts and a person conceivably could have owed a fiduciary duty to . . . entities and individuals under federal but not state law, or under state law but not federal; under general trust but not agency law, or under agency law

11

but not general trust." *Lusk*, 2017 WL 508589, at *10 (internal quotations and citation omitted).

The impermissible vagueness of the honest services fraud statute's fiduciary relationship requirement is particularly acute in this case. Here, the defendants are located in various different states, with little to no relationship to one another, involved in different types of relationships with the alleged victims of honest services fraud, who allegedly engaged in separate and distinct conduct, and are being prosecuted in a jurisdiction with which they had limited contacts (where venue was apparently manufactured by the government after Singer began cooperating with it). Depending on the source of the applicable fiduciary duty—state law, federal law, common law, or some combination of the three—different defendants may be subject to different standards, or stuck subject to a standard that normally would not apply to them but for the presence of another defendant in the case whom they have never met.

For example, in Massachusetts (where the prosecution is venued), independent contractors (like Williams was with the College Board and ACT) "does not typically owe a fiduciary duty for the services it performs." *See, e.g., Spring Inv'r Servs., Inc.*, 2013 WL 1703890, at *7 (citing Massachusetts law). Yet, Massachusetts courts have cautioned that the "circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case." *Warsofsky v. Sherman,* 326 Mass. 290, 292, 93 N.E.2d 612 (1950) (listing examples of fiduciary relationships); *see also Patsos v. First Albany Corp.,* 433 Mass. 323, 335–36, 741 N.E.2d 841 (2001) (specific circumstances determine whether fiduciary or arm's-length relationship exists between investor and broker).

On the other hand, in California (where a number of the defendants reside and many of the alleged acts occurred), there are *two kinds* of fiduciary duties—those imposed by law and those undertaken by agreement. *See GAB Business Srvcs., Inc. v. Lindsey & Newsom Claim*

*Srvcs., Inc.*, 83 Cal.App.4th 409, 416 (2000). "[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law." *Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 221 (1983). "Under prevailing judicial opinion no presumption of a confidential relationship arises from the bare fact that parties to a contract are employer and employee; rather, additional ties must be brought out in order to create the presumption of a confidential relationship between the two." *Odorizzi v. Bloomfield School Dist.*, 246 Cal.App.2d 123, 129 (1966).

Texas (where Williams resides and allegedly engaged in the chargeable conduct) takes yet a different approach. Like California, Texas recognizes two types of fiduciary relationships. Unlike California, under Texas law the two types of fiduciary relationships are (i) "a formal fiduciary relationship, which arises as a matter of law and includes relationships between attorney and client, principal and agent, partners, and joint venturers"; and (ii) "an informal fiduciary relationship, which may arise from a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App. 2003) (internal citations and quotations omitted). But "mere subjective trust does not . . . transform arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W. 2d 171, 177 (Tex. 1997).

Meanwhile, under federal law "[a] fiduciary is generally defined as a person who is required to act for the benefit of another person on all matters within the scope of their relationship." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (internal citation and quotation omitted). At the "heart of the fiduciary relationship [under federal law] lies reliance, and *de facto* control and dominance." *Id.* (quotitng *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991).

This case, perhaps more than any other, crystalizes Justice Scalia's concern with the "most fundamental indeterminancy" of the honest services fraud statute statute: "the character of the 'fiduciary capacity' to which the bribery and kickback restriction applies." *Skilling*, 561 U.S. at 421 (Scalia, J., concurring in part).  Absent a clear delineation of the source, scope, and nature of a fiduciary duty required to sustain an honest services fraud prosecution, there is no way Williams had fair notice that her conduct may violate the honest services fraud statute.

### D.  The "money and property" mail and wire fraud predicate offenses must be dismissed.

The money and property mail and wire fraud predicate offenses to the alleged RICO conspiracy charge must also be dismissed. There are no allegations that Williams agreed that she or someone else would engage in any scheme to deprive either the College Board or ACT, Inc. of money or property. Accordingly, the Indictment does not sufficiently allege that Williams agreed to commit money or property mail or wire fraud. Those predicate offenses must therefore be dismissed.

Mail and wire fraud statutes are "limited in scope to the protection of property rights." *Cleveland v. United States*, 531 U.S. 12, 18 (2000), quoting *McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Traditional property rights include items such as money or land.  *See, e.g., Cleveland*, 531 U.S. at 18-25. If there is ambiguity in the application of the definition of property, the Supreme Court has instructed that lower courts use the rule of lenity. *See Cleveland* 531 U.S. at 25, *quoting Rewis v. United States*, 401 U.S. 808, 812 (1971). Many courts have found that certain allegations of intangible rights did not constitute a property right for the purposes of mail or wire fraud.  *See, e.g., United States v. Henry*, 29 F.3d 112, 114-15 (3d Cir. 1994) (the right to a fair bid is not a property right, even if a winning bid would have resulted in the receipt of property); *United States v. Ratcliff*, 381 F. Supp. 2d 537 (M.D. La. 2005) (salary paid to an elected candidate, who had not properly reported campaign

contributions, was not money or property because no money or property was lost, only the intangible right to a fair election); *United States v. Bruchhausen*, 977 F.2d 464, 468 (9th Cir. 1992) (manufacturer has no property interest in the destination of its products); *Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991) (finding that market share is not a property right under the mail fraud statute); *Westchester County Independence Party v. Astorino*, 137 F. Supp. 3d 586, 606 (S.D. N.Y. 2015) (right to a free election is not a property right under mail and wire fraud statutes); *see also Berroa*, 856 F.3d at 148 (holding that defendants did not violate mail fraud statute by using fraudulently-obtained test scores to obtain medical licenses that were then used to provide health care services in exchange for a fee because the causal nexus between the fraud and the fee paid was too attenuated).

For example, egulatory licenses and permits did not constitute a cognizable property right under the mail and wire fraud statutes. *Cleveland*, 531 U.S. at 15. The Supreme Court rejected the government's theories in part because the object of the alleged fraud must be property in the hands of the victim; it does not suffice that the object is property to the recipient. *Id.* at 15. Here, the test scores may be considered property to the students who take the tests. For example, the ACT itself states that "[s]tudents own their test scores and may direct ACT to delete their scores for a particular test date." Help/FAQ's: How do I delete a test date record?, ACT Inc., https://www.act.org/content/act/en/products-and-services/the-act/help.html#testday.

The Government may try to argue that ACT and College Board have property interests in the test scores since they reserve the right to cancel the test and test scores, forfeiting the registration fee, if a student is suspected of or observed cheating. *See, See ACT Terms and Conditions* at 4, available at https://www.act.org/content/dam/act/unsecured/documents/Terms-and-Conditions.pdf (last accessed December 12, 2019); *see also College Board Terms and Conditions* at 11, available at https://collegereadiness.collegeboard.org/pdf/sat-terms-and-

conditions.pdf (last accessed December 12, 2019).  However, the Supreme Court in *Cleveland*

considered and rejected the idea that the expectation of stream of revenue or the "right to

control" or "right to exclude" necessarily established property rights. *Id.* at 23. Other courts have

continued to apply these findings. The mail and wire fraud statutes are not implicated if two

parties enter a transaction triggered by a fraudulent scheme, but the transaction is simply one that

the victim may have avoided except for the deceit or the victim does not face tangible economic

harm.  *See United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015); *United States v. Finazzo*,

850 F.3d 94, 111 (2d Cir. 2017). Courts have "repeatedly rejected application of the mail and

wire fraud statutes where the purported victim received the full economic benefit of its bargain."

*Binday*, 804 F.3d at 558; *see also Bruchhausen*, 977 F.2d at 467-68 (no property right when

transaction would not have been entered into except for the deceit, in part because there was no

monetary loss).

Accordingly, the ACT and SAT tests do not constitute a cognizable property right.  Even

if ACT and College Board had a right to control and exclude who received access to their tests,

that alone is not enough because the right to control and right to exclude do not automatically

establish property rights for purposes of mail and wire fraud.  There must also be a showing of

tangible economic harm. ACT and College Board did not incur any tangible economic harm—

rather, these entities received the full registration fee in exchange for the student sitting for the

test, and therefore ACT and College Board received the "full economic benefit" of the

transaction. And even if ACT or College Board chose to cancel test scores based on a suspicion

of fraud or cheating, they would retain their registration fee. Indeed, in *US v. Abbott*, both Judge

Talwani and the Probation Office found that the testing services did not suffer pecuniary harm.

Memorandum and Order, September 13, 2019, Dkt 443; Probation Office's Submission in

Response to Court's Order of September 10, 2019, September 11, 2019, Dkt 440.  Furthermore,

Williams did not preclude ACT and College Board's right to control who had access to the test: Williams had authority to access the tests through her role as an independent contractor and the students had been registered through the proper channels. *See United States v. Czubinski*, 106 F.3d 1069, 1074 (1st Cir. 1997) (reversing conviction because while confidential business information may constitute a cognizable property right, an employee's actions to "merely access" confidential information through unauthorized searches did not sustain a wire fraud conviction).

In *United States v. Berroa*, the First Circuit reversed money and property mail fraud convictions of defendants who obtained falsified scores on Puerto Rico's standardized test for issuance of medical licenses. 856 F.3d 141. The defendants bribed an employee of the board that administered the tests to falsify the scores. *Id.* at 147-48. The First Circuit noted that in *Cleveland*, the Supreme Court "did not rest solely on the fact that the government's theory of prosecution stray[ed] from traditional concepts of property," but "went on to note that the government's preferred reading of the statute would result in a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." *Id.* at 149 (citing *Cleveland*, 531 U.S. at 20-24) (quotations omitted). Following the rationale of *Cleveland*, the Court held that the medical licenses did not qualify as "property" under § 1341, and reversed the defendants' conviction under that statute.[3]

For the same reasons that the licenses at issue in *Berroa* did not constitute a cognizable property interest under the mail and wire fraud statutes, the test scores issued by the College

---

[3] While reversing the "tangible property" mail fraud conviction, the *Berroa* court affirmed the defendants' honest services fraud conviction. But on that point *Berroa* is clearly distinguishable, because that case—unlike this one—involved an employer being derpyied of the honest services of its employee (and, arguably, bribery of a public official). 856 F.3d at 154-55. The Supreme Court in *Skilling* expressly identified these types of relationships, as opposed to the relationship at issue in this case, as the kind where the existence of a fiduciary relationship "was usually beyond dispute." *Skilling*, 554 F.3d at 407 n.41.

Board and ACT, Inc. are not a property interest of which those alleged victims could have been deprived. At best, the application of the property framework to the tests and test scores is ambiguous. Therefore, this Court should apply the rule of lenity in the face of this ambiguity as directed by the Supreme Court. *Cleveland* 531 U.S. at 25.

### E. The money laundering predicate offense must be dismissed.

Finally, the money laundering predicate offense to the charged RICO conspiracy must be dismissed because it does not allege that Williams agreed that she or another defendant would engage in any financial transaction using the proceeds of a specified unlawful activity.

"The crime of money laundering comes in two varities, 'promotional' and 'concealment.'" *United States v. Ayala-Vazquez*, 751 F.3d 1, 14-15 (1st Cir. 2014) (citing *United States v. Cedeño-Perez*, 579 F.3d 54, 57 (1st Cir. 2009)). "An individual is guilty of promotional money laundering if (1) knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, he (2) conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity, (3) with the intent to promote the carrying on of specified unlawful activity." *Id.* (internal citations and quotations omitted). "To convict an individual of concealment money laundering, the government must prove the first to elements of promotional money laundering and, third, that the person conducts the financial transaction knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of the specified unlawful activity." *Id.* (citations and quotations omitted).

For purposes of the money laundering statute, the term "proceeds" includes "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). But because "[m]oney laundering is an offense to be punished separately from the underlying criminal

offense," it cannot occur until after "the predicate crime becomes a 'completed offense." *United States v. Gross*, 661 F.App'x 1007, 1021-22 (11th Cir. 2016) (quotations and citations omitted).

Here, the Indictment does not allege that Williams agreed to, or intended for, another alleged RICO co-conspirator to engage in a financial transaction involving the proceeds of an unlawful activity, either to conceal the source of illegal proceeds or to promote illegal activity. Rather, the Indictment only alleges that parents of children paid Singer some amount of money, typically structured as a donation to KWF, and then Singer paid that money to pay Williams and Riddell to facilitate cheating on the exams. *See* Indictment at ¶ 42, 44. The Indictment alleges that this was done with the purpose of "concealing the nature and source of the bribe payments by funneling payments through the KWF charitable accounts." *Id.* at ¶ 39(c). But even assuming that allegation to be true, it fails to state a money laundering offense because the money paid by the parents to Singer is not alleged to be the proceeds of illegal activity. *See United States v. Lucena-Rivera*, 750 F.3d 43, 49 (1st Cir. 2014) "[S]imply because money is used to promote future unlawful activity it does not necessarily follow that the money was earned through prior unlawful actvitiy."); *United States v. Harris*, 666 F.3d 905, 910 (5th Cir. 2012) ("Money does not become proceeds of illegal activity until the unlawful activity is complete[.]")  Rather, the Indictment alleges nothing more than that the parents paid "clean" money to Singer, who then used that money to payWilliams.

For these reasons, the money laundering predicate offense to the charged RICO conspiracy must be dismissed.

**F.    The Government's complaint did not sufficiently plead facts to support the existence of a criminal enterprise.**

For the reasons stated in co-defendant, Donna Heinel's, motion to dismiss. Williams would also move to dismiss the indictments. Williams joins that motion in its entirety and incorporates its arguments here.

## IV.     CONCLUSION

For the foregoing reasons, the Court should grant Williams' motion and dismiss the counts against her. Because the Indictment does not sufficiently allege an intent or agreement by Williams to commit (or have another person commit) two or more requisite predicate offenses, or adequately plea facts to support the existence of an enterprise, the RICO conspiracy must be dismissed as to Williams. Moreover, the indictment does not sufficiently plead allegations of the predicate offenses. Lastly, because the Indictment to not sufficiently support a basis for any honest services fraud, those counts must too be dismissed.

Respectfully Submitted,

NIKI WILLIAMS
By her attorney,

Dated:  December 17, 2019          /s/ Eric Tennen
                                   Eric Tennen, BBO #650542
                                   Swomley & Tennen, LLP
                                   50 Congress Street, Suite 600
                                   Boston, MA 02109
                                   617.227.9443
                                   etennen@swomleyandtennen.com

### CERTIFICATE OF SERVICE

I, Eric Tennen, hereby certify that on December 17, 2019, this document, filed through the CM/ECF system, will be sent electronically to all registered participants in this matter as identified on the Notice of Electronic Filing (NEF).

/s/ Eric Tennen
Eric Tennen