<pre>
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   UNITED STATES OF AMERICA,              )
                                            )
 5            Plaintiff,                     )
                                            )
 6        v.                                 )      Criminal Action No.
                                            )      1:19-cr-10081-IT-9
 7   NIKI WILLIAMS,                          )
                                            )
 8            Defendant.                     )
                                            )
 9   _____


10


11        BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


12

             SENTENCING HEARING BY VIDEOCONFERENCE
13


14

                     Monday, December 21, 2020
15                          2:20 p.m.


16


17


18


19


20
     John J. Moakley United States Courthouse
21   Courtroom No. 9
     One Courthouse Way
22   Boston, Massachusetts


23
     Robert W. Paschal, RMR, CRR
24   Official Court Reporter
     rwp.reporter@gmail.com


25
</pre>

1                    **A P P E A R A N C E S**

2

   On behalf of the Government:

3
        UNITED STATES ATTORNEY'S OFFICE
4       BY:  LESLIE WRIGHT
        1 Courthouse Way
5       Suite 9200
        Boston, MA  02210
6       (617) 748-3367
        leslie.wright@usdoj.gov
7

8
   On behalf of the Defendant:
9
        SWOMLEY & TENNEN, LLP
10      BY:  ERIC B. TENNEN
        50 Congress Street
11      Suite 600
        Boston, MA  02109
12      (617) 227-9443
        etennen@swomleyandtennen.com
13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          (In open court at 2:20 p.m.)

3          THE DEPUTY CLERK:  United States District Court is

4    now in session, the Honorable Judge Indira Talwani presiding.

5          This is Case Number 19-cr-10081, United States

6    versus Niki Williams.  Will counsel please identify

7    themselves for the record.

8          MS. WRIGHT:  Good afternoon, Your Honor.  Leslie

9    Wright appearing for the Government.

10          THE COURT:  Good afternoon.

11          MR. TENNEN:  Good afternoon, Your Honor.  Eric

12    Tennen on behalf of Ms. Williams.

13          THE COURT:  Good afternoon, who -- and Ms. Williams

14    is here by videoconference.

15          So before we go any further, I just want to remind

16    everyone who is on the line that Local Rule 83.3(a) prohibits

17    rebroadcasting or taping this videoconference hearing, and

18    with that, I'm going to proceed with the waiver.

19          Ms. Williams, you are appearing today by

20    videoconference for your sentencing, and so I'm going to go

21    through and describe the arrangements here and make sure that

22    you're comfortable proceeding this way.

23          I'm physically present here in the courtroom.  Your

24    lawyer and the prosecutor are appearing by video.  On your

25    screen you should see me, my courtroom deputy, the lawyers,

1    the court reporter, and Ms. Victoria from the probation

2    office.  There are no spectators here in the courtroom, but

3    the courtroom is unlocked.

4         If you have any trouble with the video or phone

5    connection or you cannot hear or see what is happening, let

6    me know.  Speak up, wave your hand, and I'll stop and see how

7    we can take care of it.  If you need something repeated let

8    me know.  The court reporter is preparing a transcript of

9    this proceeding, but no recording of the video itself will be

10   preserved.

11        Now, you have the right to be physically present in

12   open court for this proceeding, but you can waive that right.

13   Before I ask whether you intend to waive your right, you

14   should know the following:

15        Today is December 21, 2020.  We are experiencing a

16   worldwide epidemic caused by the coronavirus.  The president

17   of the United States and the governor of Massachusetts have

18   each declared a state of emergency.  Congress has passed an

19   emergency statute that permits defendants in criminal cases

20   to appear in court by video or telephone for certain types of

21   proceedings under certain circumstances.

22        Our normal procedure before the emergency was to

23   have all defendants physically present in the courtroom for

24   sentencings.  We are attempting as best as we can to protect

25   the health and safety of our court employees, lawyers,

1    defendants, security personnel, and everyone else who is

2    involved with the court system.

3            At the same time, we are attempting to permit the

4    basic functions of the court to go forward without

5    unnecessary delay.  The physical appearance of defendants and

6    counsel in the courthouse and their transportation to and

7    from the courthouse are likely to increase the health risks

8    for all persons involved as well as the general public.

9            To try to minimize the health risks, among other

10   things, we are giving defendants who prefer to appear in

11   court by video the option to do so.  It's voluntary.  You do

12   not have to appear by video, but if you do choose to appear

13   by video, I will ask you to waive your right to be physically

14   present.

15           You should also know that you have the right to a

16   public proceeding conducted in open court.  Again, our normal

17   procedure before the emergency was to have all such

18   proceedings in open court in public view.  As I said, the

19   courtroom is open.  In light of the -- the courtroom is open,

20   but no one is here but me.  In light of the emergency caused

21   by the pandemic, and as I announced on our website, we are

22   permitting members of the public to have access to this video

23   proceeding.

24           And, Ms. Marchione, are there members of the public

25   on the line?

1           THE DEPUTY CLERK:  Yes, Your Honor, there are.

2           THE COURT:  Thank you.

3           So with that, do you understand that you have the

4   right to be physically present in open court for your

5   sentencing?

6           THE DEFENDANT:  Yes, I do.

7           THE COURT:  Do you understand you have a right to

8   consult with your lawyer during the sentencing?

9           THE DEFENDANT:  Yes.  Yes.

10           THE COURT:  Do you understand that if you wish to

11   speak with your lawyer during sentencing, you should just let

12   me know, and I will make arrangements for the two of you to

13   have a private conversation?  Do you understand that?

14           THE DEFENDANT:  Yes.

15           THE COURT:  Do you understand you have the right to

16   hear and see everything that happens in court during your

17   sentencing?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Do you understand that, because I only

20   have a single camera here, you can only see part of the

21   courtroom?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Do you understand that your family

24   members and other supporters have the right to attend this

25   proceeding?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And have you consulted with your lawyer

3    concerning waiving your right to appear in person?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And do you agree to waive your right to

6    appear in person for your sentencing and instead appear by

7    video?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you also agree that to the extent

10   that your right to public access to this proceeding is in any

11   way impaired, you waive that right?

12         THE DEFENDANT:  Yes.

13         THE COURT:  And to counsel, is there any reason I

14   should not accept the waiver?

15         MR. TENNEN:  No, Your Honor.

16         MS. WRIGHT:  No, Your Honor.

17         THE COURT:  I find that the defendant has knowingly

18   and voluntarily waived her right to appear physically and has

19   knowingly and voluntarily agreed to proceed by

20   videoconference.

21         I also find that Ms. Williams's sentencing cannot

22   be further delayed without serious harm to the interests of

23   justice.  As Ms. Williams represented in the December 15,

24   2020, joint motion to conduct the sentencing via

25   videoconference, having now pleaded guilty, Ms. Williams

1    would like to proceed with sentencing as soon as possible so

2    that she may complete her sentence and move on with her life.

3           Because Ms. Williams resides in Texas, delaying

4    sentencing until it is reasonably safe for Ms. Williams to

5    travel to Massachusetts would constitute a delay of unknown

6    and indefinite length.

7           I further find that the measures taken to provide

8    public access to this proceeding are reasonable under the

9    circumstances and that, to the extent that the defendant's

10   right to public access to this proceeding is in any way

11   impaired, the defendant has knowingly and voluntarily waived

12   that right.  So I accept the waiver and will proceed directly

13   to sentencing.

14          Let me go through the documents I have received and

15   read:  I have the presentence report that was prepared on

16   November 16, 2020, and revised on December 14, 2020.  I have

17   the Government's sentencing memorandum, both in redacted and

18   unredacted form.  I have the defendant's sentencing

19   memorandum and accompanying exhibits that was filed

20   December 14th.

21          I have the superseding indictment; the plea

22   agreement that was signed August 11, 2020, and filed

23   August 12th; the victim impact statements from ACT, Education

24   Testing Service, and the College Board; and the Government's

25   motion for forfeiture filed December 15th.  To my knowledge,

1   there was no other material that's been submitted.

2              Is that correct, Counsel?

3              MR. TENNEN:  Yes, Your Honor.

4              MS. WRIGHT:  That's correct, Your Honor.

5              THE COURT:  And to probation, was any information

6   withheld from the presentence report pursuant to

7   Rule 32(d)(3)?

8              THE PROBATION OFFICER:  No, Your Honor.

9              THE COURT:  Thank you.

10             Ms. Wright, any witnesses, victims, evidentiary

11  matters of any kind?

12             MS. WRIGHT:  No, Your Honor.

13             THE COURT:  Mr. Tennen, have you had an opportunity

14  to review all the materials submitted in connection with the

15  sentencing?

16             MR. TENNEN:  Yes, Your Honor.

17             THE COURT:  And have you gone over it with the

18  defendant?

19             MR. TENNEN:  Yes.

20             THE COURT:  And I realize, as I listed the material

21  you submitted, it included an affidavit as well as letters

22  and an article.  So I have reviewed all of that.

23             Ms. Williams, have you reviewed all the material

24  that was submitted in connection with sentencing?

25             THE DEFENDANT:  Yes.

1          THE COURT:  And have you had a chance to discuss it

2    with your counsel?

3          THE DEFENDANT:  Yes.

4          THE COURT:  And, Mr. Tennen, were you expecting any

5    evidentiary hearing today?

6          MR. TENNEN:  I'm not sure, Your Honor.  I think the

7    one issue is just the amount of money that should be

8    attributed to the forfeiture.  It has possible -- well,

9    depending on how you rule on the guidelines, I don't think it

10   changes anything, if I'm anticipating how you're going to

11   rule on it; but in theory, it could impact the guidelines in

12   some ways.  So I don't know how to handle that.

13          I submitted the affidavit.  Hopefully that was

14   enough to give the Court a heads-up that it might be an

15   issue, but beyond that, given where we are, on Zoom, I really

16   don't know how the Court best wants to address it.

17          THE COURT:  Well, let's go through -- the dollar

18   amount will matter because of the -- there's an order of

19   forfeiture at issue.  So we have to resolve that issue, but

20   why don't we go through and see where we are after we get

21   through the presentence report.

22          So I have reviewed the presentence report.  I have

23   an objection from the Government and three objections from

24   Ms. Williams.  With regard to the Government's objections,

25   these -- am I correct, these are the same objections that

1    were raised in the prior sentencings in this case and in the

2    Abbott case?

3           MS. WRIGHT:  That's correct, Your Honor.  We have

4    submitted these objections previously, and Your Honor has

5    ruled on them.  So we don't have anything further.  We'll

6    just rest on our written submission.

7           THE COURT:  Okay.  So my ruling is the same as

8    before, and I am following the calculation that the probation

9    office has done.  And I guess I characterize the financial

10   calculation differently than the Government has and that has

11   some impact on the numbers, but I will go -- overrule the

12   Government's objections as I have before.

13          With regard to the defendant's objections, the one

14   issue is the amount of the payments, which I think we have to

15   address.  The second issue is the minor role adjustment,

16   which we should discuss.  And then there is an objection

17   regarding some characterizations with regard to her medical

18   records.  I think probation responded.  Is there anything

19   else that needs to be done there?

20          MR. TENNEN:  It wasn't really an objection.  We had

21   records that we tried to locate that, ultimately, we were

22   unsuccessful in locating.  I was just letting probation know

23   that we were making efforts to do it.

24          THE COURT:  Okay.  And I have reviewed the comments

25   as put forth by Ms. Victoria.

1        So let me start with -- I think we'll get to the

2    dollar value subsequently, because based on the probation

3    calculation, the dollar doesn't come in here.  It'll come in

4    with regard to forfeiture.

5        MR. TENNEN:  Right.  It's not -- sorry.  For

6    guideline purposes, my objection is no longer necessary.

7        THE COURT:  Okay.  So -- although if -- once we

8    resolve it, I would resolve it across the board so that

9    the --

10       MR. TENNEN:  Right.

11       THE COURT:  -- record is clean one way or another,

12   but let's address the rest of the guideline calculation.

13       Actually, let me change gears here.  Let me --

14   let's go and let's talk about the dollar value, because it

15   has some view, also, on the -- as I think about your

16   adjustment for minor role.  So let's just talk about the

17   evidence I have as to the amount of money that Ms. Williams

18   was paid.

19       I have Ms. Williams's affidavit stating that on the

20   first three occasions, she was paid $2,500 in cash on each of

21   those three occasions, and those transactions went through

22   Mr. Fox, and that on the last occasion, it went directly from

23   Mr. Singer, and it was in the amount of $5,000.

24       And the Government contends that Mr. Fox contends

25   that the dollar amounts were greater.  I believe, according

1    to the presentence report, Mr. Fox claims that the dollar

2    amount on the December 2015 test was between 5,000 and 7,500;

3    on the June 2016, Mr. Fox says it was between 5,000 and

4    10,000; and the October 2016, Mr. Fox says it was between

5    5,000 and 10,000.

6              So, Ms. Wright, you have the burden of proof here.

7    What's the evidence I have to support the claim that it was

8    more than 2,500?

9              MS. WRIGHT:  Yes, Your Honor.  All we can really

10   cite to for today's purposes is what's in the PSR, and those

11   are Mr. Fox's statements to the best of your recollection --

12   sorry.

13             THE COURT:  But just to go -- I mean, because if we

14   were in a trial we would talk about hearsay on hearsay on

15   hearsay.  The probation office gets a statement of the

16   offense from your office.

17             MS. WRIGHT:  Correct.

18             THE COURT:  So it's in the presentence report, but

19   it's your office's statement that this is the amount.

20             MS. WRIGHT:  Yes, Your Honor.

21             THE COURT:  And your office's statement is based on

22   Mr. Fox's proffer, but I don't have an affidavit or anything

23   from Mr. Fox, and he didn't testify -- he didn't speak to

24   this in the -- his Rule 11.

25             MS. WRIGHT:  That's correct, Your Honor.  And what

1    I can say is that those proffer statements are based on the

2    best of his recollection.  As Your Honor noted, those are

3    ranges that he gave based on the best of his recollection,

4    and we did not have an affidavit to submit.

5              Obviously, these payments were made in cash, so

6    it's really his recollection as opposed to the defendant's,

7    and we understand that the defendant has submitted an

8    affidavit here.

9              THE COURT:  So -- and I'm curious, just -- given

10   that you have the burden of proof, and given that you have

11   one defendant who has said under oath that this is what she

12   received and has represented how little money she has -- that

13   seems to not be in dispute -- and how she would know the

14   difference between getting 2,500 and 5,000, and you have

15   another defendant who is also a defendant in this case who,

16   on these four transactions, received $137,500, by your count,

17   why would we credit -- why would the Government credit his

18   representation what he paid to Ms. Williams over hers?

19             MS. WRIGHT:  And I don't disagree with your

20   characterization, Your Honor.  All I can say is that we have

21   taken the lower amounts of the range as he provided to take

22   the most conservative figure, and the other factor I would

23   point to is that the $5,000 figure is consistent with the

24   known amount that was paid by check by Singer to Williams for

25   the final test.

1          THE COURT:  I'm just going to push you a little bit

2    more on this because I find it surprising that you're asking

3    me to make this call.  And the reason I find it surprising

4    that you're asking me to make this call is these are both

5    defendants in this whole mess.

6          There is nothing here in front of you -- of me to

7    suggest that there's any reason why the Government should

8    think that Mr. Fox is more likely to be telling the truth

9    than Ms. Williams.  You've made no suggestion that he has a

10   greater level of credibility or any reason why the Government

11   would think what he's saying makes sense.

12         And, frankly, what he's saying doesn't have the

13   same indicia of -- as you have acknowledged, he's vague.  He

14   doesn't remember.  Those amounts -- those dollar amounts are

15   insignificant to him in the scheme of things, versus a person

16   who really knows the difference between 2,500 and 5,000.

17         And while you're saying it's consistent with the

18   payment Mr. Singer made, the payment Mr. Singer made cut out

19   Mr. Fox.  So it really has no bearing on what Mr. Fox deemed

20   to pay Ms. Williams.  There wasn't any arrangement between

21   Mr. Fox and Mr. Singer that's in the record as to how much

22   Ms. Williams should be paid.  It was just whatever Mr. Fox

23   presumably thought he was going to pay.  So I don't know how

24   the 5,000 would be an indicia of anything.

25         MS. WRIGHT:  It's just that that is consistent with

1    what -- it's -- when cash payments are made like this,

2    Your Honor, it's difficult for us to have any certainty

3    whatsoever as to the exact amounts; however, when we do have

4    a final record with a written check that's in bank records

5    for $5,000, and that that is consistent with the amounts that

6    Mr. Fox said that he paid, that's the amount that we went

7    with, Your Honor.

8               THE COURT:  Okay.  But you wouldn't disagree with

9    me, would you, that the Government hasn't been able to prove

10   that it is more likely than not -- the probability

11   standard -- you haven't -- you wouldn't disagree with me,

12   would you, that the Government has not met its burden of

13   showing that it is more likely that the amount was the

14   greater amounts?

15              MS. WRIGHT:  From the Government's perspective, the

16   final payment of the $5,000 does push it over the more likely

17   than not standard, but --

18              THE COURT:  Even though -- even though -- I mean,

19   Counsel, the -- you know, if you're -- if you're trying to

20   prove something and you're looking at what somebody is

21   proving, you're looking if it's the same person making the

22   payments and things like that or the same person taking

23   certain kinds of action.  This is a different person making

24   the decision of how much money to go to Ms. Williams.

25              I'm just -- I -- you know, it's safe for you to

1    make this because I can clean it up for you, but you have a

2    plea agreement that doesn't allow her to appeal the amounts,

3    and you're suggesting that the Government is proving that it

4    is more likely than not that she was paid 20,000 rather than

5    12,500, and I just -- I don't understand how you can

6    extrapolate to a more likely than not standard from one

7    payment from a different person over the vague -- I mean,

8    Mr. Singer isn't saying Ms. Williams was supposed to have

9    been paid 5,000 every time, is he?

10             MS. WRIGHT:  That's correct, Your Honor.  And while

11   there are different people making the payments, it's the same

12   person accepting the payments for the exact same conduct that

13   was repeated.

14             Furthermore, while we have the word of two

15   different defendants up against one another in this

16   circumstance, one of those defendants has a reason to

17   minimize that amount because it affects that defendant.

18   Whereas the --

19             THE COURT:  I would think it affects both.  I mean,

20   frankly, to have Mr. Fox have been paid on the first occasion

21   70,000 for this transaction, of which he only gave -- whether

22   it's by his account 5,000 to 7,500, or her account, 2,500,

23   he's picking up the giant share of this.  I mean, just from

24   the way of how would you look at somebody from their role, I

25   think he has an enormous reason to suggest that he wasn't

1    pocketing it all.

2            MS. WRIGHT:  Well, respectfully, Your Honor, I

3    mean, if he was going to lie about the amount that he paid

4    her to minimize how much he made, you would think that he

5    would say, "I paid her half," or "I paid" -- I mean, he

6    gave -- the estimates he gave were to the best of his

7    recollection, and they were, as Your Honor noted, small in

8    comparison to what he received.

9            THE COURT:  He's suggesting it could be $10,000,

10   when Mr. Singer was only paying 5,000 for the whole thing

11   after having cut Mr. Fox out of this last go round.

12           I -- it's just surprising me.  So I find that the

13   Government has not met its burden of showing that the amount

14   was more than the 12,500, and so that is the amount that I'm

15   going to be using here as I go forward in making the

16   calculations.

17           So now let's talk about the role in the offense.

18   And, Mr. Tennen, you had an objection on this point.

19           MR. TENNEN:  Sure, Your Honor.

20           And I will say, at the end of day, I think it

21   doesn't make a difference because the -- whether you accept

22   it or not, the guideline range is the same as still in

23   Zone A, as probation notes.  So out of an abundance of

24   caution, I still made that in case things were going to go

25   differently.

1          I do think it's a valid objection in that I do

2     think that, when you put Ms. Williams in her place of this

3     conspiracy compared to everybody else, she fits all the

4     criteria, all the hallmark criteria of being a minor

5     participant.

6          She is -- she knew nobody, not even really Mr. Fox.

7     Mr. Fox found her through a connection that he had at Yates

8     High School.  She was not somebody who put anything into

9     motion.  She's not someone who had any control over this.

10    She took orders and didn't question much or push back in any

11    way.  She didn't know the families.

12         And the amount of money, even at the Government's

13    estimation, pales in comparison to the amount of money that

14    was being given to others on the sort of -- the indictment

15    before you, on that side of things, the administrator

16    indictment, and even pales in comparison to what some of the

17    parents put forth on their own behalf.

18         THE COURT:  What's your response, though, to the

19    point that probation made in response, which was, you know,

20    in a way, this wouldn't have happened without her?  She held

21    the keys to -- to the room where the testing was happening --

22    I mean, literally held the keys there -- and if she hadn't

23    been there, this couldn't have proceeded?

24         MR. TENNEN:  I think this could have happened with

25    any administrator, anyone who had the ability to administer

1    tests the way Ms. Williams did, had they, you know, found any

2    of those people.  Her role did nothing in terms of planning

3    how this was going to happen or putting the pieces in place.

4           She was somebody that they found to do this, but

5    they could have found anybody in her place.  For example, you

6    know -- but not, for example -- couldn't have replaced

7    Riddell, for example, who took the tests or some of the --

8    you know, or the parents, things like that.

9           So to me, she really is one of the only -- you

10   know, her and arguably the person on the West Coast are the

11   most replaceable of anybody in this conspiracy because they

12   just needed someone who could administer tests, and there are

13   hundreds if not thousands of people who can do that in

14   Houston, in Texas, and beyond.

15          THE COURT:  But what about the argument that this

16   is -- I mean, yes, there are hundreds of thousands of people

17   who could abuse their position of trust, but she was the one

18   that they were able to convince to do that?

19          MR. TENNEN:  No, no.  I agree.  She was the one,

20   and she agrees that she was the one and she did that.  But

21   it -- in comparison to what the other people had to do to put

22   this into place, she was the last piece, and she could have

23   been anybody; and that's why I think she's a minor

24   participant, because she was necessary in the sense of she

25   ultimately agreed to do this, so she's the one who was the

1    last piece that allowed the testing to go through, but it

2    could just have easily been any of the other hundreds if not

3    thousands of administrators before you.

4           And you can't say the same for everybody else who

5    is part of the conspiracy.  There are people who are just

6    irreplaceable that this could not have happened without, and

7    she is someone who would have been replaceable had they found

8    anybody else.

9           THE COURT:  Ms. Wright, if you can respond to

10   that -- and perhaps focusing it a little bit on the

11   particular requirements set forth in the guidelines, the

12   degree -- I mean, basically -- I guess, maybe I should frame

13   the question this way.  I think probation's point is well

14   taken in that she was in a position of trust and that she

15   sort of held the keys at the end.

16          But I also see where Mr. Tennen is arguing.  If you

17   actually go through the guidelines, the degree to which she

18   understood the scope and structure of the criminal

19   activity -- pretty minor -- the degree to which she

20   participated in planning or organizing the criminal activity

21   seems to be zero.  She just did what they told her to do.

22   The degree to which she exercised decision-making authority

23   or influenced the exercise of decision-making authority --

24   that wasn't her role.

25          And then the responsibility, discretion the

1    defendant had in performing -- the nature and extent of her

2    participation, including the acts she performed and the

3    responsibility and discretion the defendant had in performing

4    the acts -- I would assume that would be where you would find

5    it, but -- and then the degree to which she stood to benefit;

6    and, for example, a defendant who does not have a proprietary

7    interest in the criminal activity and is simply being paid to

8    perform tasks should be considered for an adjustment under

9    this guideline.

10            MS. WRIGHT:  Sure, Your Honor.  And I would just

11   push back a little bit on the decision-making authority,

12   although it kind of does revert back to the point of her

13   being the gatekeeper.  Obviously, in each instance, she had

14   the decision-making authority to say yes or no.

15            And, especially, I would point to the Buckingham

16   exam, and it was within her power to let that happen how it

17   did, to not even purport to administer the exam.  So she did

18   have some ability to decide whether to say yes or no and to

19   do it in whatever manner that Singer was suggesting.

20            THE COURT:  But isn't that what -- isn't that what

21   every criminal defendant has done, is said yes or no to that

22   opportunity?  I mean, let's assume, for example, the bottom

23   line courier in a drug operation.  You could say similarly he

24   could have said yes or no.  Is it similar to that?

25            MS. WRIGHT:  Well, fair enough, Your Honor.  But I

1    guess I'm thinking really specifically in terms of the

2    Buckingham exam and her role as a standardized test

3    administrator; you know, she could have pushed back on --

4    doing it in a different way, doing it in a less egregious, a

5    less blatant way.

6            The other thing I would point to with respect to

7    the decision-making authority is her completion and

8    submission of the forms to ACT.  We don't have any indication

9    that anyone else in the conspiracy instructed her as to how

10   to do that or whether to do that, how to complete those, to

11   verify all the information in those forms.  And so that is

12   something I would point to, that she did have the discretion

13   and authority to do that on her own, and she did.

14           But moving, I think, to the more forceful point is

15   the nature and extent of the participation.  While it's true

16   that Ms. Williams did not profit as handsomely as many

17   involved in this scheme, she did do it multiple times.  There

18   were five tests.  There were four instances of cheating.  And

19   while she didn't make a great deal of money for each of those

20   instances, she did stand to profit the more times it

21   happened.  So the larger Singer's organization, the more

22   times he did this test-cheating scheme for more families, the

23   more she stood to profit personally.

24           THE COURT:  Well, was she -- you know, it's

25   interesting because when I was looking at the dates -- I was

1    a little surprised about this -- but the first event happened

2    in December of 2015, and then you have two events in June and

3    October of 2016, but you don't have anything -- she wasn't

4    involved in this in 2017 or 2018 until Singer was

5    cooperating, and as part of her cooperation -- his

6    cooperation, contacted her for the last one.  Am I wrong

7    about that?

8              MS. WRIGHT:  No, Your Honor.  The final -- the

9    Buckingham exam, the final exam, Singer was not yet

10   cooperating at that point.  That all occurred over the

11   wiretap.

12             THE COURT:  I see.  That was before?

13             MS. WRIGHT:  Correct.

14             THE COURT:  Okay.  So that was still happening on

15   his own?

16             MS. WRIGHT:  Correct.

17             THE COURT:  Okay.  Okay.  Well, I -- I don't have

18   to make a formal determination under the guidelines because

19   it doesn't make any difference whether it counts or not.  I

20   do think she had a lesser role, clearly, than Fox, Riddell,

21   and Singer, who were all involved together with her.

22             I do think probation's point is well taken that

23   this was -- the fact that this was more than one occasion

24   weighs a little bit against it, but I think I'm going to just

25   duck that objection and just make the determination that I

1    don't need to make the determination.  To the extent I do, I

2    accept probation's numbers and will use that as my starting

3    point.

4            So that gets us to a total offense level of five

5    after the acceptance of responsibility, no criminal history

6    points, so we have -- under the statute, she faces not more

7    than 20 years' imprisonment; under the guidelines, it's zero

8    to six months; under the statute, a statutory range for

9    supervised release of not more than three years; under the

10   guidelines, one to three years.

11           Statutory range for probation is one to five years,

12   under the guidelines, not more than three years.  A fine --

13   the statutory range not more than $250,000; guideline range,

14   $500 to 9,500.  And then I don't think there's a claim for

15   restitution, correct?

16           MS. WRIGHT:  That's correct, Your Honor, there is

17   not.

18           THE COURT:  And then we have the forfeiture motion,

19   which was seeking $20,000, but based on my determination,

20   that will be entered for 12,500.

21           MS. WRIGHT:  And, Your Honor, we will submit -- we

22   will file a revised motion with the correct amount --

23           THE COURT:  Thank you.

24           MS. WRIGHT:  -- based on Your Honor's ruling.

25           THE COURT:  Thank you.  And that special assessment

1    of $100.

2            So with that, I'll hear the Government's

3    recommendation.

4            MS. WRIGHT:  Thank you, Your Honor.

5            Pursuant to the terms of the parties' plea

6    agreement, the Government is respectfully recommending that

7    the defendant be sentenced to a term of imprisonment of six

8    months followed by one year of supervised release.  The

9    Government's believes that a meaningful prison sentence is

10   warranted here in light of the serious nature of the

11   defendant's crime and the need for general deterrence.

12           The defendant, a public school teacher's aid and a

13   compensated standardized test administrator, actively

14   participated in Rick Singer's colleague entrance exam

15   cheating scheme over a span of approximately 2½ years,

16   accepting bribes from Singer and Martin Fox to facilitate

17   cheating on SAT and ACT exams on four separate occasions.

18           On one of these occasions, the defendant did not

19   even purport to administer the exam, instead brazenly

20   providing Mark Riddell with a copy of the test to take in his

21   hotel room on behalf of the student.  Any connection with

22   each of the four ACT exams that she purported to administer

23   to the children of Singer's clients, the defendant falsified

24   forms that she submitted to ACT, Inc., to make it appear that

25   the exams were administered properly when, in fact, the

1     defendant had knowingly facilitated cheating.

2          While a first-time offender, the defendant readily

3     agreed to violate the duties she owed to the testing agencies

4     in return for cash.  Defense counsel asserts that she did so

5     not for the money, but in a misguided attempt to help the

6     students.  However, as a teacher especially should know and

7     as acknowledged by the defendant in a letter that she

8     submitted to the Court, helping a student to cheat is no help

9     to the student at all and, in fact, causes serious harm.

10          Defense counsel further contends that this was an

11    aberrant act of an objectively goodhearted person, and while

12    the defendant's goodhearted nature is certainly reflected in

13    the many letters submitted to the Court on her behalf,

14    facilitating cheating on multiple occasions over a span of

15    years can not be written off as an aberration or a small

16    indiscretion.

17          Finally, while she is certainly not the most

18    culpable of those charges in the colleague admissions cases

19    and did not profit the most handsomely, the defendant played

20    an integral role in the test-cheating aspect of Singer's

21    scheme.  Her position as a standardized test administrator

22    and her willingness to violate the duties she owed to the

23    testing agencies made the cheating possible.  As discussed,

24    it simply could not have happened at the Houston test center

25    without her willing involvement.

1          The defendant not only defrauded the testing

2     agencies that relied on her to administer the exams properly,

3     but also undermined public confidence in the integrity of

4     college entrance exams and the college admissions process

5     more broadly.  Such conduct requires a meaningful sentence

6     for purposes of just punishment and to afford adequate

7     deterrence.

8          And for all these reasons, Your Honor, the

9     Government respectfully requests that the Court sentence the

10    defendant to a term of imprisonment of six months followed by

11    one year of supervised release.

12         THE COURT:  Thank you.

13         I understand that when you're giving me sentences

14    and looking at their relative sentences, you're asking for --

15    compared to other defendants.  You're referencing the

16    sentences you've asked for.  But when I look at treating

17    similarly situated defendants similarly, the similarity isn't

18    what does the Government ask for, but sort of how does this

19    play out in realtime in real life.

20         And so perhaps you can help here by, first of all,

21    letting me know where you think Ms. Williams fits in, in the

22    scheme.  You've said she's not the most culpable.  Would you

23    agree with Mr. Tennen that she's the least culpable?

24         MS. WRIGHT:  Well, I guess that -- in -- with

25    respect to the test-cheating aspects of Singer's scheme,

1    Your Honor?

2              THE COURT:  Either way.

3              MS. WRIGHT:  I don't know that I would say she's

4    the least culpable.  I think among the most similarly

5    situated defendants -- which I would agree with Your Honor

6    are, if you want to look at Singer first and then Fox,

7    Dvorskiy and Riddell, I believe those are the most similarly

8    situated -- I would agree that she is the least culpable

9    amongst those defendants.

10             THE COURT:  Okay.  And if you broaden it a little

11   bit more to include some of the people like Ms. Sarah or some

12   of the others who are involved in the KWF enterprise -- less

13   culpable, more culpable?

14             MS. WRIGHT:  I would agree that she's less culpable

15   and that she only had insight into this one aspect of

16   Singer's enterprise.

17             THE COURT:  Okay.  And then if you were to expand

18   it more broadly compared to the role of the coaches -- less

19   culpable or more culpable?

20             MS. WRIGHT:  I think you'd have to look at each

21   coach and the number of times they engaged in the conduct

22   that we're discussing; however, if you were looking at it

23   just for -- a broader view of accepting bribes in exchange

24   for violating your duty of honest services, whether it's, you

25   know, to the testing agencies in this defendant's situation

1    or to the university, as it is in the coaches', she's

2    certainly less culpable than someone like Donna Heinel or

3    Gordon Ernst who did it repeatedly and made substantial

4    amounts of money.  But perhaps a coach that only did this

5    once or twice, she is, I would say, fairly equally culpable.

6              THE COURT:  And when the Government has pushed for

7    using the other guideline measure, one of the things you've

8    talked about is the dollar and profit, the total money that

9    the people made on this.  Am I correct that Ms. Williams was

10   paid the least of anybody -- now that you're using my $12,500

11   sum -- that she was paid the least of anybody in this

12   enterprise, or of a group of people charged?  I mean --

13             MS. WRIGHT:  Of the charged defendants, I believe

14   that's correct, Your Honor.

15             THE COURT:  Okay.  And then if you were to compare

16   what her -- how you view her offense versus now looking even

17   more broadly, she's charged with the same crime as the

18   parents, how would you compare her offense to the parents?

19             MS. WRIGHT:  Yes, I think that's -- that's a tricky

20   question, Your Honor, and I actually did think about that

21   when we were discussing the role as well, because in terms of

22   insight into Singer's organization and the nature and scope

23   and all aspects of it, I would say that Ms. Williams's -- is

24   similarly situated to some of the parents who perhaps did the

25   test cheating one time and didn't know all the players.

1              However, as defense points out in their

2    submissions, those parents paid substantial amounts of money

3    and also realized a significant benefit, whether that was

4    just the enhanced -- fraudulently enhanced score or an actual

5    admissions spot to a university, either through the athletic

6    recruitment scheme or based on that fraudulent score.  So

7    perhaps they stood more to gain.

8              However, on the other hand, this defendant was in

9    that position of trust that we discussed in a way that the

10   parents were not, and it was her abuse of that position that

11   allowed all this to happen.  So in that sense, I would say

12   she's more culpable than some of the parents.

13             THE COURT:  Okay.  Thank you.

14             Mr. Tennen?

15             MR. TENNEN:  Thank you, Your Honor.

16             I know you've read the memo, but I did just want to

17   put some things on the record in open court about

18   Ms. Williams that I think are important and that you should

19   be considering.

20             I do think that Ms. Williams stands apart from just

21   about everybody else.  Your Honor knows more about everybody

22   else than I do, and there are some people who I've read

23   little about.  So I'm saying almost, based on my knowledge.

24             But I think she stands about -- stands apart from

25   almost everybody else in that she appears to me to be the

1    only one that didn't come into this from a life of privilege.

2    She has led a life of many hardships, and throughout that

3    life of hardships, she has always, always put others before

4    herself.

5              This is someone who, when you talk to, is full of

6    positivity.  When you read the PSR, you know, and how she

7    talks about her life and how things were growing up, she

8    always spins things as good as she can, despite the fact that

9    this is someone who lived in a single-family home, whose

10   mother worked a lot, who lost her mother when she was

11   younger, not a youth, but younger, in her 20s, who lost her

12   home to Hurricane Katrina and was displaced to Houston, who

13   had to start all over, who worked a job that was very

14   fulfilling to her, but paid her relatively -- not a lot,

15   $20,000 a year.  And yet, when she talks about things,

16   everything is always wonderful.

17             This is someone who spent her life in service of

18   others, most notably her students -- not only, but most

19   notably, her students, and that is just overwhelming,

20   over- -- comes across overwhelmingly when you read all the

21   letters about her.  These -- I've never seen letters like

22   this where -- people normally say, "Oh, I know this person.

23   This is a good person.  Please," you know, "be good to this

24   person."

25             All the letters here are telling you all of the

1    specific ways in which Ms. Williams gave of herself, when she

2    barely had anything to give.  And I think that's important

3    because I don't think that is true for everyone else involved

4    in this scheme.  Everyone else came at this scheme with

5    some -- wanting something for themselves or for a family

6    member, if you will.

7         There -- and you could say not -- was it necessary?

8    Because they lived a life where they shouldn't have had to do

9    that, where they had a lot already in opportunity, where they

10   had a lot already in terms of financial stability and were

11   looking just to gain through that, and that is not where

12   Ms. Williams comes from.

13        When I talk about her involvement in this case, I

14   don't think Your Honor has taken this, this way, but I'll

15   just be blunt about it:  It's not to say that she didn't know

16   she was doing something wrong.  She absolutely did, and she

17   says that in the letter.  She said that to probation.  You

18   know, she knew that this was not right.

19        But, again, the reason for getting involved, in her

20   distorted way, was "I'm not doing something right, but I'm

21   helping students who need help," because that's what she

22   always did.  She was a special needs teacher, and she was

23   told that these are special needs students, which from all

24   appearances, you know, seems to be true in terms of what she

25   knew.  These are people who actually got special need waivers

1     outside of her presence, and so that's who she thought she

2     was helping.  Knowing she was doing something wrong, she

3     thought ultimately the person who was going to benefit was

4     going to be a special needs student, who were the kinds of

5     students she worked with all her life.

6            I think that matters.  She didn't come at this

7     saying, "Oh, my, God, I just found a way to make money."

8     And, in fact, if you look through all the evidence the

9     Government has, there was never talk about money.  She got

10    what she got, and she was happy with that.

11           Again, I'm not trying to minimize.  She was

12    certainly happy with that.  She knew she was getting money

13    for something she shouldn't be doing.  But she was never

14    asking for any amount or pushing for anything.  When Singer

15    talks to her, you have that whole -- that's the only recorded

16    consideration.  He offers it up, and she says, "Oh, really?

17    Okay.  Great.  Thank you."  So I don't think that could ever

18    be seen as her motivation to do this, and I think that

19    matters.

20           I think that -- so Your Honor should take that into

21    account that she came into this scheme differently than

22    everybody else, and the story of her life is different than

23    everybody else.  And she has paid a steep price for this.

24    And what I mean by that is a steep price for who she is and

25    where she was, so that the very first thing that happened

1    before she even pled guilty, but just by virtue of being
2    charged, is she lost her job at the high school where she had
3    worked for, you know, 15 to 20 years -- I forget the exact
4    number right now -- but where she had worked for a very long
5    time, a job that was her life, that she put everything into.
6             And you can see from the letters, you know, the --
7    her participation in that school went way beyond what her
8    duties were, way beyond her classroom responsibilities.  But
9    all the time, she volunteered for after school programs and
10   for her cheerleaders and for students who just needed a meal
11   or a place to stay.  Her job was everything to her, and she
12   lost that, and that was a blow, an absolute blow to her.
13            It was also a financial blow because that was her
14   only source of income.  And unlike everybody else in this
15   case who can fall back on savings, who can fall back on
16   careers that aren't -- you know, that are going to be just
17   fine as they get through this, she did not have it, and she
18   does not have this.  She still doesn't have this.
19            She had a very hard time finding employment after
20   she got let go.  It wasn't going to happen -- she wasn't
21   going to get another job in the education field, at least she
22   couldn't find one.  She had a hard job finding a job,
23   generally.  When she finally found something, COVID hit.  And
24   three weeks into being a food service worker, at -- she got
25   laid off from that and continued to struggle to find

1    something.

2              Finally, recently, she was able to find a job as an

3    administrator of sorts and -- for a real estate company or a

4    real estate agent, I should say.  And that's -- she's been

5    fortunate to have that, but no -- you know, even that is not

6    as good as her -- what she was making financially before,

7    which even then wasn't that great.

8              So she has really struggled through this, and she

9    is not just going to bounce back when this is all over the

10   way I envision just about everybody else in this matter

11   bouncing back because they have financial stability, because

12   they have careers that can weather this.  You know, and for

13   some of them, this may even be a boost.  So she doesn't have

14   that.  So --

15             THE COURT:  I don't think we have anybody for whom

16   this is a boost.  I think that's a --

17             MR. TENNEN:  Well, I --

18             THE COURT:  You can say that it doesn't impact

19   people the same, but I don't think you can fairly say that

20   it's been a boost for anybody.

21             MR. TENNEN:  I -- fair enough.  I have something in

22   mind, but I'll leave at that.

23             So, you know, that impact financially and just her

24   ability to do what she loved and help those students has

25   really been a blow.  I think it's telling that, when she

1    talks about this in her letter and to probation, you know,

2    she is concerned -- she talks about how she feels bad for the

3    students she let down, almost before anybody else.  And she

4    talks about even the students in this case who she doesn't

5    even know, feeling bad that she may have set them back, and

6    that's the last thing she wanted to do.  So I think all that

7    matters.

8           The forfeiture amount is something that it's going

9    to take her a very long time to pay off.  That is a really

10   hard thing that she is going to have to deal with moving

11   forward.  And she, you know, can't just write a check or, you

12   know, pay a fine the way some of the other defendants can.  I

13   think that matters.

14          I think all that goes to the point that

15   incarceration is not necessary and I think would be -- would

16   really set her back.  She finally has some employment.  She

17   finally has some stability.  I do not think that that should

18   be disturbed.  She needs that desperately.  She really does.

19          I think incarceration is not necessary, also,

20   because it's not always necessary.  It really isn't.  And

21   sometimes people commit crimes.  Sometimes, you know, they

22   deceive or they defraud, but the -- we don't have to send

23   them to prison.  We can manage them in other ways.

24          This is not someone who I think Your Honor should

25   be or is -- I don't know -- but I don't think Your Honor

 1    should be worried about her doing something like this again

 2    because of -- what has happened to her, you know, far

 3    outweighs any of the benefits that she may have gotten from

 4    this offense and will continue to do so.  So I don't think

 5    that this is someone who needs to be deterred.  I think this

 6    is someone who needs to be given as much opportunity to grow

 7    and move beyond this as possible.

 8            The guidelines, as calculated by Your Honor, being

 9    a zero to six, in a Zone A, as I've always understood that --

10    I don't actually think I've ever had a defendant in a Zone A

11    before -- but as I've always understood that and looked at it

12    from afar from some of my other cases, presumes a

13    nonincarcerated sentence unless there's some reason to give

14    an incarcerated sentence, and I don't see any reason here.  I

15    don't see any reason why she shouldn't get a nonincarcerated

16    sentence.

17            I don't think anyone is asking for a fine.

18    Obviously, I don't think there should be a fine.

19            I -- my recommendation was a year of probation.  I

20    come at that for a couple of reasons.  First is she has

21    already -- this case has dragged out, through no fault of

22    anyone, but because of the pandemic, we have just been

23    delayed, delayed, and delayed.  And she has been, since day

24    one, essentially, supervised in this case and has shown that

25    she can comply with all conditions without any issue and has

1   a good relationship with her probation officer in Houston.   I

2   think that was reported in the PSR.

3           So a lengthy probation is not necessary to put her

4   on track as it might be for some other people who may have

5   had a shorter pretrial/probation period, who may have been

6   held during pretrial/probation or something look those lines.

7   So the length of it, I think, is just not necessary to do

8   what we are seeking to do with sentencing.

9           The other reason I ask for probation is slightly

10   symbolic.  I don't think that even a sort of a one-day,

11   time-served, supervised-release sentence is appropriate

12   because I don't think she should be seen as receiving a

13   sentence for this, not so much because of what she did, but

14   because of who she is.

15           And I think someone like her should get some

16   benefit of the life she's lived before she was ever involved

17   in this, never knowing that she was going to be involved in

18   something like this, should get some benefit of the way she

19   has served others.  And that benefit should be that, you

20   know, for when she got involved in this for the reasons she

21   did and where she is in life, she won't be sentenced, but she

22   will be given probation and a chance to right whatever wrong

23   she has committed and move forward.  So that's why I

24   recommend what I did recommend in terms of one year of

25   probation.

1          Beyond that, I think that's everything I have.  I

2     know Your Honor has read the letters.  And I know I've said

3     this, but the diverse -- the diversity of people who came

4     forward, all seeing the same person, I think is impressive.

5     You have from principals to pastors to former students to

6     relatives, old and young, and they all paint the same exact

7     picture of who she is, and that is remarkable.  For someone

8     to give that impression so consistently across so many

9     aspects of her life, I think just speaks volumes of who she

10    is and why Your Honor should not give her an incarcerated

11    sentence.

12          So that's -- that's all I have.

13          THE COURT:  Thank you.

14          Okay.  Ms. Williams, did you want to speak at this

15    time?

16          THE DEFENDANT:  No, ma'am.

17          THE COURT:  Okay.

18          MR. TENNEN:  I'm sorry, Your Honor; I had asked

19    her.  I should have said I had asked, and she had indicated

20    to me that she had the letter and she wasn't -- didn't want

21    to say anything further.

22          THE COURT:  And I have read the letter.  Thank you.

23          In sentencing, I'm required to consider the factors

24    set forth at 18 U.S.C. Section 3553(a), and I have done that

25    here, and I want to go through sort of my thinking and then

1    tell you about the sentence that I'm going to impose.

2            The nature and circumstance of the offense, we have

3    had -- is it now a year and a half of almost -- almost two

4    years of going through all of these cases.  I think everyone

5    recognizes that this was a pretty audacious scheme and that

6    it impacted a lot of people and it impacted sort of trust and

7    confidence in our admissions system.

8            But that said, I do agree with your attorney that

9    your role in here in this event was a little bit different

10   than some of the other participants, and I see your offense.

11   It certainly wasn't -- it can't be written off in any way.

12   You made a decision to make money in a way that was illegal,

13   and you knew it was illegal, and you knew it wasn't what you

14   were supposed to do.

15           But I -- I can't get -- I can't ignore that your

16   relative role, whether it's a formal departure or just

17   considering it here under the factors, I went through and I

18   made myself a little chart of the amounts that these families

19   paid, amounts of 95,000, 75,000.  Three families paid 75,000,

20   one family paid 95,000, and one family paid 50,000.

21           And out of that $370,000 that ended up buying test

22   scores, you were paid 12,500.  So 3 percent of the total

23   profit went to you in this scheme, and 97 percent went to

24   other people.  So I have to say I do think it's not

25   insignificant that you did this on four occasions.  You

1    probably would have continued doing it.  There was no reason

2    not to continue doing it if this has continued, for all I

3    know; but nonetheless, relative culpability here, it's just a

4    nature of a different factor here.

5            And I just sort of want to say, also, you know,

6    this offense, which is that you deprived your employer -- or

7    here was an independent contractor relationship -- but you

8    deprived them of your honest -- they were deprived of your

9    honest services.  In most cases in the private sector, that's

10   penalized by getting fired.

11           And it's been made clear, because this is what this

12   is -- it wasn't just a small private matter -- it amounted to

13   a federal crime.  You have a felony conviction.

14           Mr. Tennen, I really don't agree with your

15   portrayal of a question of "symbolic because this isn't

16   really" -- something, something.  This is really a felony

17   conviction, and she is going to be suffering the consequences

18   of a felony conviction regardless of how much time she does

19   or doesn't end up serving here.

20           So it is -- it was a -- it could have been seen as

21   a private crime, but it isn't.  It's a bigger crime.  It

22   amounts to a felony, but within that whole scheme, she's

23   3.3 percent of the total amount here.

24           I consider next defendant's personal and criminal

25   history and characteristics.  And, you know, I think almost

1    every defendant who has appeared in front of me so far has

2    asked me to think of this has somewhat aberrational behavior.

3    And it has caused me to sort of think about, you know, good

4    people sometimes do bad things, and bad people do good

5    things.  I don't know.

6          In your case, there is a difference here.  Your

7    personal history shows this truly as an aberration, and I say

8    it in -- looking at -- you don't have any other debts other

9    than your student loan.  You have lived within this meager

10    salary.  You have been working historically throughout your

11    life.  You worked and you regularly worked, and you were

12    making $25,000 a year or $20,000 a year, and you lived within

13    your means, and you weren't out there buying things and

14    trying -- this was not -- this was -- certainly, you did this

15    for the money, but this wasn't any pattern of self-interest

16    in any kind of a larger scale.

17          And in considering your personal and criminal

18    history, I have to tell you I found the letters from your

19    employer just really different than most -- what I mostly

20    see.  To have been fired from a school district for this and

21    to nonetheless have a letter from the superintendent and from

22    the people you worked with attesting to your commitment for

23    over all of those years, that part of your personal history

24    shows to me that everyone in your world knows your work

25    ethic, knows your dedication to, in fact, doing your job and

1     doing your job right.  And it makes me see this as a bad

2     mistake you made, a very bad mistake, but not something that

3     would dictate that you would be likely to ever do something

4     like this again.

5          I go through the sentencing ranges, how to avoid

6     unwarranted sentencing disparities.  It does seem to me that

7     you are the least culpable of the defendants here, that you

8     have suffered great consequences of this conviction in losing

9     your job and losing your opportunity to continue working as a

10    teacher or as an assistant teacher, and so I don't think a

11    noncustodial sentence would result in any unwarranted

12    sentencing disparities.

13         So the sentence that I have determined to impose I

14    believe reflects the seriousness of the offense, which is

15    that you now have a felony conviction.  You have lost your

16    job and your ability to even be teaching, but I don't think

17    you need any additional custodial time.  You will have to pay

18    back the 12,500.  The total proceeds that you made, you will

19    have to pay back to the Government.  And I am going to impose

20    a one-year probation sentence.

21         I don't -- I want to be very clear:  I don't agree

22    with Mr. Tennen's characterization of probation.  This is not

23    probation in the sense of let's see how you do, maybe you --

24    you know, this isn't state law, "Let's continue without a

25    finding, and maybe if you're really good, this gets wiped

1    away."  This is on your record.  You have it.  But I'm not

2    imposing imprisonment.  And under our sentencing scheme, if I

3    don't impose imprisonment but I do want you to be supervised,

4    the term for that is "probation," and that's what I'm

5    imposing.  And during that one year, you will need to comply

6    with all of the requirements.

7             So just -- my reasoning for the sentence, I think

8    it is sufficient.  It's not greater than necessary to serve

9    the policies.

10            I will be imposing probation for one year, no fine

11   based on an inability to pay, forfeiture in the amount of

12   12,500, all of the mandatory conditions of probation and --

13   including paying the assessment imposed on a schedule to be

14   determined by the court, and additional -- you must notify

15   the Court of changes in your economic circumstances that

16   might affect your ability to pay, and the $100 special

17   assessment.

18            So that's the sentence I'm going to impose.  Any

19   objections before I formally impose it?

20            MS. WRIGHT:  No, Your Honor.

21            MR. TENNEN:  No, Your Honor.

22            THE COURT:  So, Ms. Williams, just my last few

23   sentences before I formally impose sentence, I don't mean by

24   this sentence to suggest that you're not being punished.  I

25   think you have been punished.  And I think you know you've

1    been punished.  You do have a felony conviction, and while

2    you're on probation, you cannot vote in the state of Texas.

3    You cannot -- you have to comply with the requirements I'm

4    going to be setting forth here.

5          But I do hope that you are able to move forward

6    with your life, and I think your work ethic before has -- is

7    the reason that I have been impressed with what you're going

8    to hopefully be able to do going forward.  I think there are

9    people who have had confidence in you, and I think that's

10    probably because you have earned that confidence from them.

11          So with that, pursuant to the Sentencing Reform Act

12    of 1984, and having considered the sentencing factors

13    enumerated at 18 U.S.C. Section 3553(a), it is the judgment

14    of the Court that the defendant, Niki Williams, is hereby

15    placed on probation for a term of one year.

16          I am not imposing a fine as I find that the

17    defendant does not have the financial ability to pay a fine.

18    I am granting the United States' motion for entry of an order

19    of forfeiture in the form of a personal money judgment, and I

20    am ordering that defendant forfeit the sum of $12,500.

21          And while on -- under the probation office's

22    supervision, you shall comply with the following terms and

23    conditions:

24          You must not commit another federal, state, or

25    local crime.  You must not unlawfully possess a controlled

1  substance.  Drug testing conditions are suspended based on my
2  determination that you pose a low risk of substance abuse.
3  You must cooperate in the collection of DNA as
4  directed by the probation officer.  You must make restitution
5  in accordance with 18 U.S.C. Sections 3663, 3663(a), and
6  3664.  You must pay the assessment imposed in accordance with
7  18 U.S.C. Section 3013, and you must notify the Court of any
8  material change in your economic circumstances that might
9  affect your ability to pay restitution -- sorry -- to pay the
10  forfeiture.
11  You shall comply with the standard conditions that
12  have been adopted by the Court, which are described at
13  sentencing guidelines Section 5B1.3(c) and which will be set
14  forth in detail on the judgment.  And I think that's it.  I'm
15  imposing, also, the $100 special assessment.
16  So I think that's all.  You do have -- the sentence
17  is imposed for all the reasons I've previously stated,
18  because I do believe it is reasonable and is sufficient but
19  not greater than necessary to accomplish the goals of
20  sentencing consistent with 18 U.S.C. Section 3553 and the
21  Supreme Court's guidance.
22  Your plea agreement limited your right of appeal,
23  and under the terms of your plea agreement, you have waived
24  your right to challenge your conviction on direct appeal or
25  in a future proceeding.  You've also waived your right to

1   file a direct appeal or a challenge to your sentence,

2   including any court orders relating to forfeiture or

3   probation, but you may still appeal on the ground of

4   ineffective assistance of counsel or prosecutorial

5   misconduct.  And if you're unable to appeal costs, you may

6   ask for permission to appeal in forma pauperis.

7         Sentence is imposed as stated.  Is there anything

8   further?

9         MS. WRIGHT:  Nothing further from the Government.

10         MR. TENNEN:  I don't know if you have to formally

11   say anything to allow her to be supervised in Houston.

12         THE COURT:  I think we do paperwork for that, but I

13   don't think there's anything else.

14         Ms. Victoria, do I need to do anything?  You'll

15   just send me the form for me to transfer supervision once

16   they want it over there?

17         THE PROBATION OFFICER:  Yes, Your Honor.  I've

18   already been in touch with Houston.  I will let them know

19   what happened, and she'll be supervised by them.  If there's

20   a request to transfer jurisdiction of the entire case, you'll

21   receive that paperwork, Your Honor.

22         THE COURT:  Okay.  But so, for now, without

23   anything further, she will continue to be supervised by the

24   probation department there in Houston?

25         THE PROBATION OFFICER:  She will.  And, actually,

1    I'll say it now while she's here on the line, her current

2    probation officer has asked that she call her after the

3    hearing, and she'll give her further instructions.

4              MR. TENNEN:  All right.

5              THE COURT:  Okay.

6              MS. WRIGHT:  Your Honor, just one other --

7              THE COURT:  Yes.

8              MS. WRIGHT:  -- last item.  The Government at this

9    time moves to dismiss Counts 1 and 8 of the superseding

10   indictment against this defendant.

11             THE COURT:  Thank you.  I would have been coming to

12   the judgment form and having to call everybody back up.  That

13   motion is granted.

14             MS. WRIGHT:  Thank you.

15             THE COURT:  Okay.  Thank you, everybody.

16             Good luck, Ms. Williams.

17             And we are in recess.

18             (Court in recess at 3:30 p.m.)

19

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

I, Robert W. Paschal, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing pages are a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 5th day of January, 2021.

/s/ Robert W. Paschal

_____

ROBERT W. PASCHAL, RMR, CRR
Official Court Reporter